Filed 9/29/15  S.B. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| S.B.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MARIN COUNTY,<br><br>        Respondent;<br><br>T.B., a minor, and MARIN COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,<br><br>        Real Parties in Interest. | A145233<br><br>(Marin County<br>Super. Ct. No. JV25941A) |

In this Welfare and Institutions Code section 300 dependency proceeding involving minor T.B.,[1] the juvenile court terminated reunification services to father S.B. and, having already bypassed services to mother Michelle B., set a section 366.26 selection and implementation hearing for August 31, 2015.  S. petitions for extraordinary writ relief, contending the court erred in finding that the Marin County Department of

---

[1] All statutory references are to the Welfare and Institutions Code.

Health & Human Services (Department) provided reasonable reunification services.  We conclude his argument lacks merit, and we thus deny the petition on its merits.

## BACKGROUND[2]

**The Family**

T. was born in May 2014.  His parents, Michelle and S., met while they were both homeless and had lived together for a year before he was born.  At the time of his birth, both T. and Michelle tested positive for methamphetamine and amphetamine.  Michelle had an older child (not fathered by S.) who was also born with a positive drug screen and was already a dependent of the juvenile court.  Michelle's reunification services had been terminated in that case, and the child was living with his father under a family maintenance plan.

**Section 300 Petition**

On May 20, the Department filed a section 300 petition alleging there was a substantial risk T. would suffer serious physical harm due to Michelle's substance abuse problem.  The petition also alleged that although S. had been living with Michelle for a year, he did not take any steps to prevent her drug use during pregnancy.  Finally, it alleged that T. was at a substantial risk of abuse or neglect because his half sibling had been abused.[3]

T. was taken into protective custody on May 21, and the juvenile court subsequently ordered him detained.  The detention order afforded both Michelle and S. three, half-hour visits per week.

---

[2] As this writ petition was brought only on S.'s behalf, we omit details concerning Michelle except where relevant to the issues before us.

[3] Additional allegations included in the original petition were later stricken and not included in the petition as sustained by the juvenile court.

**Jurisdiction**

In a jurisdiction report, the Department informed the court that both Michelle and S. were considering relinquishing T. for adoption. S., who was 56 years old, was concerned about his ability to care for T. due to his age, lack of access to family support, financial instability, housing issues, and inability to set limits with Michelle. Both parents denied any knowledge of why T. was born with drugs in his system and acknowledged they did not have suitable housing for him, as they were living in a tent (although temporarily staying in a hotel).

At a contested jurisdiction hearing on August 28, the court sustained the allegations, took jurisdiction over T., declared S. to be T.'s presumed father, and ordered three, one and a half hour visits per week for both parents.

**Disposition**

In a disposition report prepared on October 1, the Department recommended that the court order reunification services for S. but bypass reunification services as to Michelle.

In detailing S.'s history for the court, the Department described him as "a very intelligent, articulate, and thoughtful person" who had "experienced long periods of stability and sobriety."[4] He had a previous career in bio-medical engineering and technology and was living off retirement annuities and a trust fund. He acknowledged that he was ill-prepared for T.'s birth, in large part because he felt like the circumstances were a " 'bad dream' " and he kept putting off thinking about it. He believed he was unable to care for T. because of his advanced age, lack of stable income and housing, transient lifestyle, and ongoing relationship with Michelle. The parents had both expressed an intent to relinquish custody of T. and had met with the foster family to discuss an open adoption.

---

[4] S. reported that he had a history of cocaine use but, aside from one relapse, had been clean since 1995.

3

Appended to the disposition report was a proposed case plan that established the following service objectives for S.: (1) demonstrate an ability and willingness to have custody of T.; (2) obtain resources, including a stable income, to meet T.'s needs and provide a safe home; (3) maintain a relationship with T. by attending 100 percent of the scheduled visitations (three, one and a half hour visits per week); and (4) cooperate with services to achieve legal permanency. The plan also established responsibilities for S., including: (1) participation in weekly counseling to address his ambivalence about caring for T.; (2) education services; and (3) substance abuse treatment and drug testing if he experienced any relapses. With regard to the education services, S. was to attend weekly parenting education classes to develop supportive relationships with other parents to learn how to incorporate T.'s developmental needs into his lifestyle. S. was referred to Positive Parenting in Challenging Times, a drop-in program in Marin County that could be started at anytime, which was suited to S.'s needs. Once S. obtained stable housing, he was to work with an in-home parenting advocate to ensure he had the supplies and resources necessary to provide day-to-day care for T.

On October 7, the Department filed a request to reduce visitation to one and a half hours once a week, informing the court that since the August 28 order approving four and a half hours of weekly visitation, S. had attended only 36 percent of his scheduled visits and "no-showed" to 18 percent of his visits. He had also called to cancel 45 percent of his visits, usually the morning of the visit when resources had been expended and arrangements made, and often when T. had already been brought to the office for the visit. The Department further reported that on September 4, the social worker spoke with S. regarding visitation, informing him that he had only attended 55 percent of all scheduled visits since the inception of the case and inquiring whether he would be amenable to a reduction in visitation to once or twice a week so he would be more likely to attend 100 percent of the scheduled visits. S. was not in agreement with reduced visitation, stating that he would ensure he and Michelle attended all of their visits going forward. According to the social worker, however, the parents failed to attend even half

of their visits following that conversation, with S. having attended only four of 11 scheduled visits since the August 28 disposition hearing.

At a contested disposition hearing on October 29, counsel for Michelle requested a two-week continuance, explaining that the parents were in the process of relinquishing T. for adoption and had a meeting with the adoptions coordinator scheduled for the following day. She represented that if the meeting was successful, a final relinquishment meeting with the adoptions coordinator would be held the following week. Over county counsel's objection, the court granted the requested continuance.

Apparently, nothing came of the relinquishment plans, as the case came on for disposition on November 14, at which time the court ordered reunification services for S., bypassed services for Michelle, and made no changes to the visitation order. It set an interim review hearing for February 9, 2015 with a six-month review hearing on April 6, 2015.

**Interim Review**

On February 2, 2015, T.'s court-appointed special advocate (CASA) submitted a memorandum informing the court that S.'s circumstances had not significantly changed since the disposition hearing. He continued to struggle with homelessness and instability, and had not participated in the services outlined in his case plan, other than visitation. The CASA also noted that while S. had taken initial steps suggesting he was interested in relinquishing T., it appeared he was no longer pursuing that path. At the same time, however, he was not taking steps to reunify with T.

S. did not appear at the February 9 interim review hearing, but his counsel, who had spoken with him earlier that day, was prepared to proceed without him. She informed the court that S. had experienced "some increasing health issues" that made it difficult for him to attend visits, but he was still interested in visitation with T. According to his counsel, S. was still contemplating relinquishment, had met with the relinquishment social worker, and was in the process of rescheduling a follow-up appointment, but he had concerns about post-adoption contact.

5

Given that services had been bypassed as to Michelle and she continued to miss most visits with T., the court reduced her visits to one a month, with S.'s visits to continue as previously ordered.

### Six-Month Status Review

At the six-month mark, the Department recommended termination of reunification services for S. According to a status review report prepared on March 16, 2015, the Department had provided S. (both in person and via e-mail and U.S. mail) community referrals for parenting programs, housing, counseling/mental health services, food programs, and substance abuse resources including Alcoholics Anonymous. It had attempted to facilitate visits by providing S. with gas cards, Clipper cards, and bus tickets, and coordinating the visits.

The Department had also attempted to meet with S. at least once a month to review his case plan and provide all necessary referrals, but he was largely unresponsive to these attempts. Specifically, in November, social worker Audrey Zardkoohi made numerous attempts to meet with S., but he cancelled several appointments. She was finally able to meet with him in early December 2014 and again in late January 2015. Her February attempts to contact him, including four telephone calls and two letters, went ignored. Zardkoohi made herself available to meet with S. during his visits with T., but he canceled all February visits. She finally connected with him when she dropped in on a March 9, 2015 visit, at which S. acknowledged that she had left him messages but claimed he had just received them. He also acknowledged receiving the numerous referrals she had sent. They scheduled a meeting for March 16, 2015, but the morning of the meeting S. called and canceled.

As to visitation, the Department reported that in the five months since the November 14, 2014 disposition hearing, S. had participated in only 33 percent of his visits, canceling nine visits and failing to appear for another. When he did visit with T., however, he was affectionate and attentive, responding to T.'s needs by rocking him, changing his diaper, and feeding him. Given that S. had missed more than half of the possible visits, the Department recommended his visits be reduced to one per month.

6

According to the Department, S. had made "no known progress toward his case plan goals." He continued to live a transient lifestyle, moving between hotels with Michelle. He had reportedly put his name on "a few housing lists" but nothing had materialized from those efforts. He estimated he would run out of money in one or two years. Further, S. had never stated that he wanted to reunify with T. and had continually expressed an interest in relinquishing his parental rights, but he had not followed through on the process. He had expressed an interest in pursuing therapy to help him address his ambivalence around reunification and, alternatively, to help him say goodbye to T.; and the Department had provided referrals for counseling services in both Marin and Sonoma counties, but to the Department's knowledge, he had not followed through with the referrals. In light of all this, the Department recommended that reunification services be terminated and the case set for a section 366.26 permanency hearing.

The CASA also submitted a memorandum recommending the termination of S.'s reunification services in light of the lack of evidence that he was "willing or able to take the necessary steps towards reunifying with [T.]." Like the Department, the CASA noted that S. had a low rate of attending visits with T., was ambivalent about his ability to care for T., and had not made any progress on his case plan.

**The Department's Addendum to its Six-Month Review Report**

On April 24, 2015, the Department filed an addendum to its six-month review report. It informed the court that on March 23, Zardkoohi had spoken with S. about the recommendation that the court terminate reunification services. S. acknowledged that he was unable to care for T., but responded that he wanted more time. S. had contacted Catholic Charities and was hopeful the organization would be able to assist him with housing, as well as parenting and counseling services. He had contacted them two weeks earlier but had not followed up due to "unforeseen extended family circumstances that he was addressing." He had also attended four Alcoholics Anonymous meetings that month, which helped him reconnect with his spiritual life. S. told Zardkoohi he also intended to contact the relinquishment social worker because he was still leaning towards adoption.

7

The following week, Zardkoohi contacted S. to inquire whether he had engaged in any of the services offered by Catholic Charities. He had not, but had an appointment scheduled for April 3. Catholic Charities confirmed that S. had contacted them and that they would place him in their family support center, which provides temporary housing, case management, and career coaching.

On April 20, S. reported to Zardkoohi that he and Michelle had moved into the family support center. He was interested in pursuing their Rapid Re-Housing Program, which would assist with first and last month's rent provided there is a demonstrated ability to make the monthly rent payments. He was uncertain whether he was going to pursue the housing program on his own or with Michelle. The center also offered counseling services and parenting classes. S. expected to start parenting classes by the end of the week or the beginning of the following week but intended to pursue outside counseling services. He reported feeling more hopeful about being able to care for T., which he attributed to feeling better about his physical health. At the same time, he had contacted the relinquishment social worker to learn more about relinquishment; she had returned his call on April 15, but as of April 23, he had not called her back.

The matter came on for the six-month review on April 6, with S. appearing by telephone due to a claimed illness. S. informed the court that he had experienced "some difficulty with family matters" and his health. At the request of S.'s counsel, the matter was continued for a contested review hearing.

**Contested Six-Month Review Hearing**

A contested six-month review hearing was held on April 30, 2015. Social worker Zardkoohi testified first, identifying the objectives set forth in S.'s case plan and what, if any, progress he had made, as follows:

The first objective in S.'s case plan was for him to show his ability and willingness to have custody of T. He had consistently struggled with whether or not he wanted to pursue custody of T. and repeatedly told Zardkoohi that he was leaning towards relinquishing his parental rights. In a March conversation, he acknowledged he was unable to care for T. but said he wanted more time. In a more recent conversation, he

8

was more optimistic about his ability to reunify, which he attributed to feeling better about his health. Even at that point, however, he was still leaning toward relinquishment. In both conversations, he expressed his intent to contact the relinquishment social worker.

S.'s second service objective required that he obtain resources to meet T.'s needs and provide a safe home. During the review period, S. had maintained a transient lifestyle with Michelle, moving from motel to motel. A mere two or three weeks before the hearing, he had finally obtained temporary housing at a Catholic Charities shelter. Although he had moved into the shelter, he was staying in temporary, dormitory-style housing—which he described as the intake section—while he waited transfer to an individual unit. S. had been living off income from an annuity, but his family circumstances had changed and he could not access the income at that time.

The third service objective required S. to maintain a relationship with T. by following the conditions of his visitation plan. The plan allowed a weekly one and a half hour visit, and S. had attended 10 of 21 visits—slightly less than 50 percent—during the review period.[5] Three visits were canceled when T. was sick, and the 50 percent visitation rate excluded those canceled visits. When S. did attend visits, he was very affectionate and loving towards T. and their interactions were "positive."

The fourth service objective required S. to cooperate with services and achieve legal permanency. As noted, S. had consistently struggled with whether he wanted to pursue relinquishment or reunification. While he had met with the social worker in November to discuss relinquishment, he did not follow up with a subsequent meeting. He recently reached out to her on April 14; she returned his telephone call the following day, but as of the date of the hearing, he had not called her back.

The case plan also established numerous responsibilities for S. First, he was to participate in weekly individual counseling to address issues related to his ambivalence

---

[5] This was a correction from Zardkoohi's representation in the status report that he had only participated in 33 percent of the visits.

about caring for T. Since their first meeting in December 2014, Zardkoohi had provided S. with referrals on a monthly basis, but as of the hearing date, he had not participated in counseling. S. recently told her that Catholic Charities offered counseling, but he did not think its counseling was a good fit for him so he was going to look elsewhere for counseling services. He had not provided Zardkoohi with any information suggesting he had in fact engaged in counseling services.

S.'s second client responsibility included participating in a weekly parenting class in order to develop supportive relationships with other parents and learn how to incorporate T.'s developmental needs into his own lifestyle. Catholic Charities offered a parenting class, but as of April 20, S. had not started the class, telling Zardkoohi he intended to start it at the end of the week or the beginning of the following week. As far as Zardkoohi knew at the hearing, he had not availed himself of that service.

The third client responsibility required S. to obtain stable housing and work with an in-home parenting advocate to ensure that he had the resources necessary to provide for T.'s day-to-day care, including developing appropriate care routines, budgeting resources, and providing stable and adequate parenting to T. Because S. had not obtained stable housing, he had not begun in-home parenting education.

The final client responsibility was to engage in substance abuse treatment and drug testing if S. experienced a relapse. As far as Zardkoohi knew, S. had not struggled with substance abuse during the pendency of the proceeding. He had run into his old sponsor in March and attended four AA meetings after that, but he did so to reconnect with his spiritual side, not because he was struggling with substance abuse.

Zardkoohi testified regarding the specific referrals she had provided S. She referred him to the Marin County Access Line and the Sonoma 2-1-1 Access Line, which provide referrals to different resources. She also gave him a Positive Parenting referral, several housing referrals and information regarding the Marin and Sonoma Housing Authority, and referrals to food services and shelters. The Positive Parenting class was in San Rafael, although Zardkoohi acknowledged S. did not live in Marin County. She directed him to the Sonoma Access Line, which could refer him to parenting resources in

Sonoma County. When asked by S.'s counsel if she just referred him to organizations that would in turn give him more referrals, Zardkoohi denied that was the case, confirming that she referred him to organizations that provided services as well, such as Catholic Charities. Zardkoohi had not considered referring S. to any sort of "wrap" service to help him coordinate the services he had been referred to.

Zardkoohi testified that she provided referrals in both Marin and Sonoma counties because while S. resided in Sonoma County, it was unclear where he wanted to settle down. She informed him that if he found a provider outside of Marin County, she would call the provider to inquire whether he or she would accept the Marin County rate as payment for therapeutic services. As far as Zardkoohi knew, S. had not taken advantage of that offer.

Zardkoohi was aware that S. had been having health issues the past few months, but he had never conveyed to her that his health issues interfered with his ability to engage in the services she had referred him to. She was also aware he had recently experienced a death in his family, agreeing that the loss was an emotional obstacle for him in terms of engaging with services.

S. testified next and was likewise asked what he had done to accomplish his service plan requirements. As to the requirement that he determine whether he wanted to pursue custody of T., S. testified that it had been a very difficult decision to make because he was suffering from osteoarthritis in his hip that had become totally "encompassing" over the past three or four months and had created mobility problems. It was hard to sleep every night, and some days it was hard to get out of bed. S. testified, however, that he desired to reunify with T., denying any ambivalence about the situation. He believed he was qualified to care for T., expressing hope that his orthopedist could provide an effective treatment for his health issues. S. acknowledged that T. was being raised by a very loving family, and he felt fortunate about that, but he wanted more time to ensure that he had explored every avenue for T.'s benefit.

S. testified that he had experienced multiple obstacles to visiting T. His brother-in-law, with whom he was very close, had died about five months before the hearing.

11

And within the past month, his sister, with whom he was in daily contact and who managed his retirement annuities and the family money, suddenly passed away. According to S., those losses had made some components of his case plan difficult to address, and he did not feel he received the support he needed from the Department.

In attempting to address these issues, S. had called the Sonoma Access Line, which provided him with several numbers but he "didn't know how quite to . . . interface that with . . . what Marin . . . was doing." He testified he did not know whether the Department would pay for it, claiming he "could never get a specific answer" from Sonoma as to how that would work. He was eventually accepted into the Catholic Charities program and moved in on April 9, 2015.

As to visitation, S. testified that "way more than two" visits were canceled because T. was sick. He requested each time that the visit be rescheduled, but that never happened. Visits were also canceled when T. traveled with his foster family, and those were never rescheduled either.

At the conclusion of the hearing, the court took the matter under submission.

On May 11, 2015, the court found that S. failed to make substantive progress in his case plan. It therefore terminated family reunification services and set a section 366.26 permanency hearing for August 31, 2015.

S. filed a timely notice of intent to file a writ petition.


**DISCUSSION**

S. asserts one argument in his petition: the Department failed to provide him reasonable reunification services. We review the juvenile court's finding of reasonable services for substantial evidence. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010; *In re Joanna Y.* (1992) 8 Cal.App.4th 433, 439.) Substantial evidence is "evidence which is reasonable, credible and of solid value . . . ." (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

12

Applying this standard here, we conclude the court's finding that the Department provided S. reasonable reunification services was amply supported.

Reunification services, which play a critical role in dependency proceedings, must be tailored to the particular needs of the family and designed to eliminate the conditions that led to the child's removal from their custody. (§ 361.5; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793; *Mark N. v. Superior Court, supra,* 60 Cal.App.4th at pp. 1010–1011; *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458; *In re Edward C.* (1981) 126 Cal.App.3d 193, 205.) We thus judge the reasonableness of the Department's reunification efforts according to the circumstances of the case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) To support a finding that reasonable services were offered, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) The services need not be "the best that might be provided in an ideal world" but, rather, must be "reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; accord, *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969; *In re Jasmon O.* (1994) 8 Cal.4th 398, 425.)

Perhaps the biggest barrier to reunification was S.'s ambivalence about whether to attempt reunification or relinquish custody of T. Accordingly, S.'s first service objective was to demonstrate an ability and willingness to have custody of T., which required him to decide if he wanted to reunify with T. and, if so, engage in services to address obstacles to reunification. While this was a decision for S. to make, the Department sought to support S. in his decision-making by providing him referrals for counseling services. S. claims that the Department never made any effort to connect him with a therapist, but this claim is puzzling in light of the Department's express statement in its six-month status report that it provided him with several such referrals, as well as Zardkoohi's testimony to the same effect.

13

The Department also identified S.'s transient lifestyle and lack of resources as issues that necessitated T.'s detention. The case plan thus required S. to obtain the resources necessary to meet T.'s needs, including housing, income, and supplies on an ongoing basis. Zardkoohi provided him several housing and shelter referrals, information regarding the Marin and Sonoma Housing authorities, and referrals to food services. This included a referral to Catholic Charities, which not only provided housing, but offered parenting and counseling services as well.[6]

S.'s case plan also required him to maintain a relationship with T. by attending 100 percent of the scheduled visits. S. was offered supervised visitation with T. three times a week for one and a half hours each visit. In order to facilitate visitation between S. and T., the Department coordinated visits and provided S. gas cards, Clipper cards, and bus tickets in order to assist with transportation.

In addition to the foregoing, Zardkoohi made regular attempts during the review period to maintain contact with S. in order to monitor and support his progress. She met with him in December 2014 and January 2015. In February, she attempted to contact him six times, but all attempts were ignored. She sought him out at visits with T., but he cancelled all February visits. She finally made contact with him at a March 9, 2015 visit, but he then cancelled a meeting scheduled for March 16.

S. identifies a number of ways in which the services were purportedly deficient, but his claims are unsupported by the record. He complains that Zardkoohi did nothing more than refer him to "access lines" which in turn would refer him to services, but Zardkoohi testified to the contrary. When asked point-blank at the six-month review hearing if that was the case, she responded that while she did refer him to access lines (Marin County Access Line and Sonoma 2-1-1 Access Line), she also gave him referrals to actual service providers, such as Catholic Charities. And while S. testified that he

---

[6] S. claims that he "eventually took it on himself to find his own housing and services through Catholic Charities," but as we read the record, he received a referral to Catholic Charities from Zardkoohi.

contacted the Sonoma County access line but could not figure out how that "interfaced" with Marin, Zardkoohi testified that she explained to him the Department would pay an out-of-county service provider if it would accept the Department's standard rates.

S. also complains that Zardkoohi referred him to a parenting class in Marin County, even though he lived in Sonoma County. But Zardkoohi testified that it was unclear where S. planned to settle, so she provided him referrals to access lines in both counties that would also have information regarding parenting programs. Further, Catholic Charities, where S. eventually found temporary housing, offered a parenting program that he never engaged in.

This case was not, as S. argues, "thoroughly tainted by the thought of relinquishment." From the outset, S. consistently expressed ambivalence about reunification and conveyed to the Department that he was contemplating relinquishment. The Department attempted to support S. in resolving this dilemma by providing referrals to services that could help him with this decision, such as counseling, as well as to services necessary to pursue reunification should he make that decision. Its references to relinquishment in its reports updated the court at each stage as to steps S. had taken toward relinquishment or reunification; they were not evidence the Department was "hoping—if not assuming" S. would relinquish custody of T., as S. puts it.

The bottom line is that the Department offered S. reasonable reunification services to address his issues but, as the juvenile court found, he did not avail himself of those services. It is not incumbent upon the Department to "take the parent by the hand and escort him or her to and through classes or counseling sessions." (*In re Michael S., supra,* 188 Cal.App.3d 1448, 1463, fn. 5.) Instead, it was incumbent upon S. to participate in the reunification process (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441), which he failed to do in a meaningful manner. Only at the last minute—a mere two or three weeks before the six-month review hearing—did he obtain temporary housing through Catholic Charities. He contested termination of services because he wanted more time to "ensure . . . [he had] explored every avenue for the benefit of [his] son," but

15

by the point of the six-month review hearing, he had had 11 months in which to explore his options.

## DISPOSITION

The petition of father S.B. for extraordinary writ relief is denied on its merits. (Cal. Rules of Court, rule 8.490(b)(2)(A).)  The stay entered on June 26, 2015 is dissolved.  This decision is final as to this court forthwith.  (*Ibid.*)


_____
Richman, J.


We concur:


_____
Kline, P.J.


_____
Stewart, J.